UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CODY STEWART, AMY STEWART AND
FAITH STEWART AND CLAYTON STEWART,
MINORS, BY AND THROUGH THEIR NATURAL
GUARDIANS, CODY STEWART AND AMY STEWART        PLAINTIFFS

VS.                                CAUSE NO. 1:18-cv00053-HSO-JCG

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
UNKNOWN JOHN and JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z    DEFENDANTS

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE OPINIONS AND TESTIMONY OF RIMKUS CONSULTING GROUP, INC./ALLISON STOCK AND JEFFREY COOK OR, IN THE ALTERNATIVE, FOR DAUBERT HEARING

COME NOW PLAINTIFFS and file this Memorandum of Law in Support of Plaintiffs' Motion to Strike the Opinions and Testimony of Rimkus Consulting Group, Inc./Allison Stock and Jeffrey Cook. Plaintiffs would respectfully show the Court as follows:

### I. FACTUAL BACKGROUND

1. Plaintiffs in this case, along with plaintiffs in twelve other cases, have sued Defendants Hunt Southern Group, LLC, Hunt MH Property Management, LLC and Forest City Residential Management, LLC (collectively "Defendants") for personal injuries caused by mold contamination in Plaintiffs' military housing units at Keesler Air Force Base (KAFB). Plaintiffs have suffered various personal injuries as a result of this mold exposure, whether through developing or exacerbating respiratory symptoms associated with mold exposure – including, but not limited to, asthma, rhinitis, and shortness of breath, along with other immunological or physical symptoms such as headaches, body aches, and memory problems.

1

2.     Plaintiffs allege in their Amended Complaint (Document 186) that Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed; did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed, did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable, negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold and violated the implied warranty of habitability when they provided a house that was not fit for human habitation.

3.     Defendants designated Rimkus Consulting Group, Inc./Allison Stock and Jeffrey Cook as expert witnesses to provide an opinion pertaining to the potential health effects associated with the alleged exposure to mold and the timeliness and reasonableness of response by Defendants to complaints of mold in Plaintiffs' residence during Plaintiffs' residence only. Contributors to the Rimkus report are Allison L. Stock, Ph.D., MPH, MS, and a Toxicologist and Epidemiologist with Rimkus and Jeff T. Cook, a certified industrial hygienist (CIH), certified safety professional (CSP), and a Texas-licensed mold assessment consultant with Rimkus. The opinions found within the Rimkus report are joint opinions of Stock and Cook. **Exhibit A**, Report of Rimkus Consulting Group, Inc.

4.     The opinions of Rimkus with respect to all Plaintiffs are the same: that the data does not indicate an elevated level of risk from exposure to indoor mold relative to the outside environment; that Plaintiffs' medical issues were not caused by exposure to mold in their residence;  that Plaintiffs' residence did not pose an increased level of risk from mold

contamination; and that Defendants' response to complaints of mold during the time in which Plaintiffs resided in the home only were timely.

## APPLICABLE LEGAL STANDARD

5.  Plaintiffs further request that this Court conduct a hearing to determine whether the opinions in the reports of Defendants' experts are "proper and reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "To trigger a *Daubert* inquiry, an expert's testimony or its 'factual basis, data, principles, methods, or their application,' must be 'called sufficiently into question.'" *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quoting Kumho Tire Co., 526 U.S. at 149). Plaintiffs are challenging the qualifications of Defendants' experts, the relevance of their testimony, and the reliability of their opinions which warrant further inquiry by the Court.

6.  An expert witness may only offer opinion testimony if: (1) the expert's "scientific, technical, or other specialized knowledge" will assist the factfinder to understand the evidence or determine a fact issue; (2) the testimony is based on sufficient facts; (3) the testimony is based upon reliable principles and methodology; and (4) those methods and principles have been applied reasonably to the facts in this case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

7.  Before certifying an expert and admitting his testimony, the court must ensure that the proffering party has met the requirements of Rule 702. *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (citations omitted). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the Rule 702 test." *Mathis v.*

*Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002). In its gatekeeper role, the court must ensure that the expert's testimony is both reliable and relevant. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999; *see United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010); *see also Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (citation omitted).

8. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, *supra*, at 592-93. "[T]he proponent of expert testimony ... has the burden of showing that the testimony is reliable[ ] ... and must establish the admissibility requirements by a preponderance of the evidence ...." *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 765 (S.D. Miss. 2010) (citations omitted). An expert opinion is deemed reliable if it is based upon sufficient facts and data, and it is the product of reliable principles and methods. Fed. R. Evid. 702(b),(c). Otherwise, it should be excluded as "unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (*quoting Kumho Tire,* 526 U.S. at 152).

9. *Daubert* "provides an illustrative list of factors that may aid a court in evaluating reliability." *Mathis*, 302 F.3d at 460. These factors include 1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted in the scientific community. *Kumho Tire*, 526 U.S. at 149-9.

10. The *Daubert* factors are neither mandatory nor exclusive, as the trial court must decide "whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). "But the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Id.* "[W]ithout more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible." *Previto*, 766 F. Supp. 2d at 771 (quoting *Hathaway*, 507 F.3d at 318 (internal marks omitted)). *Hagan v. Jackson Cty., Mississippi*, 2016 WL 1091107, at *3-4 (S.D. Miss. Mar. 21, 2016).

11. Phrased differently, proposed expert testimony "must be supported by appropriate validation—i.e., good grounds, based on what is known." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 (punctuation omitted). Therefore, "[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir.2009).

12. Rule 702 requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue ...." Fed.R.Evid. 702(a). The "relevance prong requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir.2012) (punctuation omitted). In other words, "[e]xpert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir.2012); see also Fed.R.Evid.

**ARGUMENTS & AUTHORITIES**
**THRESHOLD ISSUE – THE OPINIONS OF RIMKUS ARE NOT RELIABLE**

13. Rimkus' opinions are unreliable because they are based upon insufficient data. Curiously missing from Rimkus' report is any mention of their involvement with the mold and moisture

issues on KAFB as early as 2012 when Forest City hired Belfor Property Restoration to inspect a vacant 2-story duplex on KAFB. After finding visible mold, Belfor recommended that Forest City hire a mechanical engineer to determine whether mechanical systems were contributing to the mold growth and offered to assist Forest City with the hiring of same. **Exhibit B**, FCRM00001455. Forest City accepted Belfor's offer resulting in Belfor hiring Rimkus and Rimkus generating a report titled "HVAC System Evaluation Keesler Air Force Base Housing" dated November 6, 2012 wherein Rimkus inspected a sample of the housing units on KAFB that had experienced mold growth and provided recommendations to help limit or eliminate the formation of the suspected fungal growth. **Exhibit C**, FCRM00000931 and **Exhibit D**, RIMKUS – SUB – 00034.

14. Jeff Cook testified in his deposition that a conflict check revealed a prior report regarding KAFB but that he did not read it. **Exhibit T** pages 39 and 40. It simply is not credible for Rimkus to now, almost seven years later, give the opinions referenced hereinabove when Rimkus had personal knowledge of the widespread mold infestation in base housing at KAFB in 2012.

15. Not only did Rimkus neglect to mention their own 2012 report in their opinion in this case, they also failed to take into consideration the following additional reports evidencing the existence of a dangerous latent defect in housing on KAFB of which Defendants had knowledge:

- September 12, 2011 Report of Limited Property Condition Assessment and Visual Infrastructure Assessment prepared by AMEC E & I INC (FCRM00000859). **Exhibit E**.
- February 17, 2012 Letter from Liberty Building Forensics Group (FCRM00000361). **Exhibit F**.
- February 17, 2012 Report of Housing Assessment for Moisture Related Problems prepared by Liberty Building Forensics Group (FCRM00000515). **Exhibit G**.

6

- August 3, 2012 Letter Bullet List to Further Delineate Implementation of Scope of Work Keesler AFB Housing Assessment for Moisture Related Problems prepared by Liberty Building Forensics Group (FCRM00000520). **Exhibit H**.

- October 2, 2012 Building Science Corporation Enclosure and HVAC Analysis of Housing Units on Keesler Air Force Base (FCRM00001096). **Exhibit I**.

- April 22, 2013 Keesler AFB Privatized Housing Complex Residential Modifications Recommendations and Observations by J.O. Collins Contractor Inc. (Hunt - Gen05 – 00193). **Exhibit J**.

- April 26, 2013 Observations on HVAC Rehabilitation from Kimbel Mechanical Systems (Hunt - Gen05 – 00471). **Exhibit K**.

- May 1, 2013 Prototype Completion Report HVAC Improvements Project (Hunt - Gen05 – 00363). **Exhibit L**.

- December 23, 2013 Report prepared by Forest City (FCRM00001001). **Exhibit M**.

- December 2, 2015 Keesler Air Force Base Enclosure & Moisture Issues Evaluation Report by Building Science Corporation (SDT SG-DB LLC 000225). **Exhibit N**.

- Maintenance history of the Subject Property from the time the land lease with the United States Air Force was entered into with Forest City Southern Group, September 30, 2011 through the date Plaintiffs signed their lease (STEWART-HUNT –GEN02-00007-00096). **Exhibit O**.

16. Both Jeff Cook and Allison Stock testified in their depositions that they did not interview Plaintiffs, did not visit any of the KAFB properties in issue, did not interview anyone with the Hunt Defendants, did not interview anyone with Forest City, did not have any inspections of the properties in issue performed on their behalf, did not review any photographs, and instead of

asking for more information just assumed that they had been given everything they needed by Defendants' attorneys. Jeff Cook deposition at pages 55-67 **Exhibit T**. Allison Stock deposition at page 77-78, 86, 91 **Exhibit U**.

17. The opinions of Rimkus are unreliable. The methodology of Rimkus is flawed. Instead of considering all that was known about the moisture and mold at KAFB, Rimkus focused only on a snapshot consisting of maintenance reports for the time period in which Plaintiffs resided in the subject property and failed to disclose their prior involvement with the issue. All opinions of Rimkus should be stricken.

### ALTERNATIVE ISSUE – THE OPINIONS OF RIMKUS REGARDING TIMLINESS SHOULD BE STRICKEN

18. Rimkus' opinions that Defendants' response to complaints of mold and the alleged presence of mold in Plaintiffs' residence were timely is irrelevant, misleading and not helpful to the jury/trier of fact. Plaintiffs' causes of action which are based upon failure to warn of a known latent defect, constructive eviction and breach of the implied warranty of habitability are based entirely upon the condition of the subject property before Plaintiffs ever moved in. The multiple reports and opinions gathered by Defendants over the years and the prior maintenance history of the subject property were not taken into consideration by Rimkus. Deposition of Jeff Cook at pages 69-70 **Exhibit T**. See also deposition of Allison Stock admitting no experience with habitability determinations and not giving an opinion on habitability **Exhibit U** at pages 121 and 123.

19. Any opinion concerning Defendants actions during the period in which Plaintiffs lived in the subject property will only serve to confuse and mislead the jury. Rimkus' opinion that Defendants responded timely to maintenance calls without opining on the quality of the service rendered is meaningless and irrelevant. See deposition of Allison Stock admitting that Rimkus is

not giving an opinion on the quality of Defendants' response to mold complaints **Exhibit U** at page 123. The only opinion that would help the jury would be an opinion that Defendants acted timely to cure the moisture and mold issues before Plaintiffs ever moved in therefore relieving them of any obligation to disclose the known latent defect to Plaintiffs and evidencing that Defendants were renting a habitable property to Plaintiffs. Rimkus cannot give such an opinion because it would have required Rimkus to visually inspect the Subject Property prior to Plaintiffs moving in which at this time is an impossibility. . It is also important to note that Rimkus has never inspected the Subject Property which alone creates a flaw in their methodology and is contrary to the deposition of Jeff Cook who testified not only that a visual inspection is necessary to determine whether mold is hazardous but also to determine whether a property is habitable. Jeff Cook deposition at pages 73 and 78 **Exhibit T**.

20. Defendants repeatedly adopted the "see it smell it" test yet their own expert has dismissed its value. Defendants admitted to the importance of a visual inspection in their Mold Management Plan wherein it is stated that "The visual assessment is the primary method in the evaluation of mold growth." **Exhibit P** Mold Management Plan FCRM00001552. The Mold Brochure made available to Plaintiffs by Defendants instructed resident that in order to "discover if I have a mold problem in my house" the resident should: Look around! The most practical way to find a mold problem is by using your eyes to look for mold growth and by using your nose to locate the source of suspicious odors." What You Should Know About Mold (Hunt – Gen05-00812) **Exhibit S.**

## ALTERNATIVE ISSUE - OPINIONS REGARDING MOLD EXPOSURE ARE UNRELIABLE AND SHOULD BE STRICKEN

21. Rimkus bases its opinion that Plaintiffs' exposure to mold did not pose an unreasonable risk of exposure to indoor mold relative to outside mold entirely upon mold test data that amounts to a snapshot of what existed in Plaintiffs' residence on the date the samples were gathered. Once again, such an opinion will only serve to mislead and confuse the trier of fact – the jury. The maintenance records are not an accurate indicator of the types of mold present in Plaintiffs' home throughout their residency at KAFB and it is circumspect for Rimkus to base an opinion regarding exposure to mold over a 15 month period on what existed in the home certain days and are not representative or indicative of the mold-infested conditions which had been affecting Plaintiffs' residence for years.

22. Rimkus purports to rely upon a threshold dose analysis which is clearly not possible to obtain in the subject property. Rimkus completely ignores the presence of any mold in the subject property and focuses instead on data that states that molds are present outdoors. To Rimkus, the existence of molds inside is inconsequential because they also exist outside. The Mississippi State Department of Health offers a different interpretation. They understand that bacteria are also outside the house and in our environment. Yet we clean our dishes, sinks, clothing, etc. to remove as much as possible, since they cause disease. The same is true for molds and mycotoxins, "Exposure to molds is not healthy for anyone inside buildings" and they allude to the significant amount of literature known to the layman as "sick building syndrome." (msdh.ms.gov).

23. Rimkus' opinion will not assist the trier of fact to understand the evidence or to determine facts in issue which pertain to Plaintiffs causing of action regarding the existence of a

known latent defect, constructive eviction and habitability. Rimkus' reasoning and methodology cannot be properly applied to the facts in issue. In other words, the opinions of Rimkus do not relate to any issue in the case are are not relevant, and ergo, non-helpful.

### ALTERNATIVE ISSUE - OPINIONS REGARDING THE LACK OF CAUSAL CONNECTION BETWEEN PLAINTIFFS' MOLD EXPOSURE AND THEIR HEALTH PROBLEMS ARE UNRELIABLE, UNSUPPORTED, AND CONTRADICTED BY THE EVIDENCE IN THIS CASE

24. Rimkus' attempts to minimize the health hazards posed by mold exposure generally, and to Plaintiffs' specifically, fly in the face of the documentary evidence produced by Defendants in discovery in this case concerning the dangers of mold. Defendants routinely disseminated information to their residents, including Plaintiffs, regarding the health hazards associated with mold, just as they disseminated training materials to their respective employees regarding the proper protocol for addressing mold clean-up and mold remediation problems after cautioning their employees to wear personal protective equipment.

25. Rimkus' opinions minimizing the dangers of mold are directly contradicted by materials disseminated by Defendants to its own staff or to military housing residents, including Plaintiffs. For example, Defendants acknowledged:

- "some common molds have been linked to allergic reactions and more serious illnesses, so it is a good idea to eliminate all mold growth from the indoor environment;"
- "both dead and living mold can produce allergic and even toxic reactions in sensitive individuals;"
- typical allergenic reactions from airborne mold exposure include: respiratory problems, nasal and sinus congestion, eye irritation, dry cough, or nose or throat irritation.

**Exhibit Q**, *Mold Awareness Training: Awareness Training for All On-Site Associates*, at 1-2 (FRCM00001609); **Exhibit R**, *Mold & Mildew: Mold Awareness for Residents of Our Apartment Community*, at 1-2 (FCRM00000096). Another document, entitled *What You Should*

11

*Know About Mold*, acknowledged similar health effects (e.g., respiratory problems, congestion, cough, nose/throat irritation, etc.), as well as more severe symptoms (including headaches, body aches, memory problems, etc.) in extreme cases. **Exhibit S**, *What You Should Know About Mold*, at 1 (Hunt – Gen05-00812). These same materials acknowledge that individuals with existing respiratory conditions, weakened immune systems, or certain age groups (i.e., infants, children, or the elderly) are the most susceptible to these adverse affects. Underscoring the potential hazards to affected individuals, Defendants' literature to residents specifically instructs them to contact a primary care physician upon any suspicion of health problems related to mold.

26. The unsubstantiated, unsupported opinions of Rimkus are contradicted by Defendants' documents, which contained admonitions such as: "If <u>any kind of mold is found growing indoors, it needs to be approached with caution and cleaned up by somebody</u>" (recommending "trained on-site staff wearing protective equipment" for small projects, and hiring outside professionals for larger projects.

27. Rimkus opines that none of Plaintiffs' health symptoms or medical treatment were related to mold exposure, instead blaming the symptoms and resulting treatment on other medical issues rather than the clear, documented mold exposure which Rimkus either chooses to ignore or dismisses as insignificant. Rimkus offers no methodology, no references, or no testable, verifiable scientific basis for its opinions, other than the fact that it does not believe that there is a causal connection. This type of *ipse dixit* expert opinion is not permitted under *Daubert* or its progeny. *Arkema*, 685 F.3d at 467, *quoting General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

28.     Furthermore, Rimkus improperly ignores the toxicity of stachybotrys which was found in the residences of other plaintiffs. In contrast, Defendants' own internal documents paint a much more serious picture, both about the dangers of stachybotrys to human health and the importance of correcting and removing infested materials in an exigent manner:

> Stachybotrys, otherwise known as "toxic black mold," feeds on cellulose wood or paper based products that have stayed wet for a week or longer. When it is found indoors it will most often be growing on wet wallboard or on ceiling tiles. If Stachybotrys is found growing inside a building it indicates that a moisture problem was not corrected quickly and materials were not dried within the first 48 hours. <u>At least one species of Stachybotrys can produce mycotoxins which can cause severe allergic reactions and possibly more serious health effects as well</u>....

**Exhibit Q**, (FRCM00001609)(emphasis added); **Exhibit R**, at 2 (FCRM00000096) (emphasis added). Rimkus' opinions lack any scientific basis, are contradicted by the facts of this case.

29.     Although Rimkus quotes from the World Health Organization, this case is in the State of Mississippi and under the auspices of the Mississippi State Department of Health whose official guidelines were ignored by Rimkus. Rimkus ignored the government agency in charge of the health residents of the State of Mississippi which has adopted the position that in addition to allergens, certain types of molds can produce toxins, called mycotoxins, found in both living and dead mold spores, exposure to which may present a greater hazard than that of allergenic or irritative molds. The Mississippi State Department of Health has also concluded that a dose-response relationship is not possible under all circumstances stating that "For some people, a relatively small number of mold spores can cause health problems. For other people, it may take many more." (msdh.ms.gov).

30.     Not only does the CDC, the New York State Department of Health, the Mississippi State Department of Health and many peer-reviewed papers identify the fact that mycotoxins are extremely hazardous to a person's health, but Defendants do also in their own Mold

Management Plan (**Exhibit P**) which states that "A small number of molds produce toxins called mycotoxins When people are exposed to high levels of mold mycotoxins they may suffer toxic effects including fatigue nausea headaches and irritation to the lungs and eyes." Curiously, the the word "mycotoxin" is absent from Rimkus' report.

31. The opinions and testimony of Rimkus should be excluded as the nature of Rimkus' testimony would consist of impermissible legal conclusions, and/or otherwise inadmissible evidence, which are neither relevant, nor reliable. The opinions and any testimony of Rimkus should be excluded by this Court pursuant to *Daubert v. Merrell Dowell Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and F.R.E. 702.

## V. CONCLUSION & PRAYER

For the reasons set forth above, Plaintiffs respectfully request the Court GRANT Plaintiffs' Motion to Strike the Opinions and Testimony of Rimkus Consulting Group, Inc./Allison Stock and Jeffrey Cook. Plaintiffs further request any additional relief to which they are entitled in law or equity.

Respectfully submitted this the 10th day of May, 2019.

        RUSHING & GUICE, P.L.L.C.
        Attorneys for Plaintiffs

BY: /s/ *Maria Martinez*
     MARIA MARTINEZ MSBN 9951
     WILLIAM LEE GUICE III MSBN 5059
     R. SCOTT WELLS MSBN 9456
     P.O. BOX 1925
     BILOXI MS 39533-1925
     Voice: 228-374-2313 Fax: 228-875-5987
     mmartinez@rushingguice.com
     bguice@rushingguice.com
     swells@rushingguice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which sent notification of such filing to all counsel of record.

SO CERTIFIED this the 10th day of May, 2019.

                                        */s/ Maria Martinez*
                                        MARIA MARTINEZ

W:\!MOLD-MM ONLY\Daubert Motions - Rimkus\Forms\Memos\Memo - Rimkus - Stewart.docx