UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CODY STEWART, AMY STEWART AND
FAITH STEWART AND CLAYTON STEWART, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, CODY STEWART AND AMY STEWART     PLAINTIFFS

VERSUS        CAUSE NO. 1:18-cv00053-HSO-JCG

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z     DEFENDANTS

**STEWART PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO STRIKE THE OPINIONS AND TESTIMONY OF
DEXTER WINN WALCOTT, MD OR, IN THE ALTERNATIVE, FOR DAUBERT
HEARING**

COME NOW PLAINTIFFS and file this Memorandum of Law in Support of the Stewart Plaintiffs' Motion to Strike the Opinions and Testimony of Dexter Winn Walcott, MD or, in the alternative, for Daubert Hearing. Plaintiffs would respectfully show the Court as follows:

**I. FACTUAL BACKGROUND**

1. Because the Court is familiar with the facts of this case, Plaintiffs will provide only a brief summary here. The Stewart Plaintiffs in this case, along with plaintiffs in twelve other cases, have sued Defendants Hunt Southern Group, LLC, Hunt MH Property Management, LLC, and Forest City Residential Management, LLC (collectively, "Defendants") for personal injuries caused by mold contamination in Plaintiffs' military housing units at Keesler AFB. The Stewart family, like the other plaintiffs, have suffered various personal injuries as a result of this mold exposure, whether through developing or exacerbating respiratory symptoms associated with mold exposure, along with other immunological or physical symptoms.

1

2.      During the course of discovery in this case, the court granted Defendants' motion pursuant to Federal Rule of Civil Procedure 35 for Mississippi Asthma & Allergy, P.A., to conduct a "Rule 35 Examination" on plaintiffs in the Stewart case as well as the nine related cases. *October 26, 2018 Order* [Doc. #75].  The examination could not include any invasive or reactive tests, including "skin tests, patch tests, or the like for any allergic reactions," though the examiner would have access to any prior tests performed on Plaintiffs. Id. at 3.  Dr. Dexter Winn Walcott, the physician who examined each of the seven members of the Stewart family, is a board-certified pediatrician and allergist/immunologist who works at Mississippi Asthma & Allergy.  Pursuant to the court's order, Dr. Walcott was required to prepare a report "which sets out in detail the examiner's findings, including diagnoses and conditions." Id.  The order further stated that Dr. Walcott may be deposed or called as a witness at trial by either party.

3.      Importantly, the fact that a physician is permitted to conduct a medical examination under Federal Rule 35 does not shield him from the appropriate scrutiny given to experts under the Federal Rules of Evidence or the applicable case law. *See EEOC v. L-3 Comms. Integrated Sys., LP*, 2018 WL 3548870 at *2 (N.D. Tex. July 24, 2018)(noting that challenges to "future admissibility and reliability" of medical examiner are not ripe at the time of Rule 35 order, but may be brought later); *Chaney v. Venture Transp., Inc.*, 2004 WL 445134 at *1 (E.D. La., Mar. 11, 2004)(recognizing that challenges to bias or fitness of a Rule 35 medical examiner should be presented through a *Daubert* challenge or cross-examination at trial).  Accordingly, Plaintiffs now bring this motion to strike Dr. Walcott's testimony, notwithstanding the Court's prior Rule 35 order allowing his medical examination, for the reasons set forth below.

## II. APPLICABLE LEGAL STANDARD

4.  Plaintiffs further request that this Court conduct a hearing to determine whether the opinions in the reports of Defendants' experts are "proper and reliable" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "To trigger a *Daubert* inquiry, an expert's testimony or its 'factual basis, data, principles, methods, or their application,' must be 'called sufficiently into question.'" *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quoting Kumho Tire Co., 526 U.S. at 149). Plaintiffs are challenging the qualifications of Defendants' experts, the relevance of their testimony, and the reliability of their opinions which warrant further inquiry by the Court.

5.  An expert witness may only offer opinion testimony if: (1) the expert's "scientific, technical, or other specialized knowledge" will assist the factfinder to understand the evidence or determine a fact issue; (2) the testimony is based on sufficient facts; (3) the testimony is based upon reliable principles and methodology; and (4) those methods and principles have been applied reasonably to the facts in this case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

6.  Before certifying an expert and admitting his testimony, the court must ensure that the proffering party has met the requirements of Rule 702. *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (citations omitted). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the Rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002). In its gatekeeper role, the court must ensure that the expert's testimony is both reliable and relevant. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999; *see United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010);

*see also Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (citation omitted).

7. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, *supra*, at 592-93. "[T]he proponent of expert testimony ... has the burden of showing that the testimony is reliable[ ] ... and must establish the admissibility requirements by a preponderance of the evidence ...." *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 765 (S.D. Miss. 2010) (citations omitted). An expert opinion is deemed reliable if it is based upon sufficient facts and data, and it is the product of reliable principles and methods. Fed. R. Evid. 702(b),(c). Otherwise, it should be excluded as "unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (*quoting Kumho Tire,* 526 U.S. at 152).

8. *Daubert* "provides an illustrative list of factors that may aid a court in evaluating reliability." *Mathis*, 302 F.3d at 460. These factors include:(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted in the scientific community. *Kumho Tire*, 526 U.S. at 149-50. The *Daubert* factors are neither mandatory nor exclusive, as the trial court must decide "whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th

Cir. 2007). "But the existence of sufficient facts and a reliable <u>methodology</u> is in all instances mandatory." *Id.* "[W]ithout more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible." *Previto*, 766 F. Supp. 2d at 771 (quoting *Hathaway*, 507 F.3d at 318 (internal marks omitted)). *Hagan v. Jackson Cty., Mississippi*, 2016 WL 1091107, at *3-4 (S.D. Miss. Mar. 21, 2016).

### III.  ARGUMENTS & AUTHORITIES

**A.     Dr. Walcott Has No Medical or Scientific Basis to Question the Quality or Duration of the Mold Exposure Suffered by the Stewart Plaintiffs.**

9.      The Stewart family – parents Cody Stewart and Amy Stewart, and minor children Faith Stewart and Clayton Stewart – lived in residential housing on Keesler AFB between August 2014 and November 2015. <u>See</u> **Exhibit 1**, *Walcott Rule 35 Report – Cody Stewart*, at 5.[1] Because no mold testing was performed on the Stewart residence during the time the Stewarts lived in their residence on Keesler, Dr. Walcott has no knowledge of whether they were exposed to mold in their home, although he still offers opinions that "the symptoms cannot be attributed to mold within the home because those same molds are common everywhere." <u>Id.</u> (without identifying which molds he opines are "common everywhere). In addition, Dr. Walcott does not have any information of whether any mold testing was completed on the Keesler house where the Stewarts lived either prior to or subsequent to their time in that home, even though any such tests could provide additional data points regarding mold exposure in the home. Without this type of information on which his causation opinions are supposedly based, Dr. Walcott's opinions with regard to the residential mold exposures suffered by members of the Stewart

---

[1] Dr. Walcott's reports for each of the Stewart family members are virtually the same (i.e., with the same discussion of his background, descriptions of various respiratory conditions such as allergic rhinitis or asthma, mold toxicity, and his common conclusion that none of their symptoms were caused by mold within the home), with the only differences being the specific medical histories of each family member. For that reason, Plaintiffs attach all of the Rule 35 reports collectively as <u>Exhibit 1</u>.

5

family are cursory and speculative. As a result, his attempts to dismiss the Stewart plaintiffs' health problems, discussed below, as unrelated to mold exposure from the Keesler residence are lacking sufficient scientific or medical basis.

**B.     Dr. Walcott's Opinions Regarding the Lack of Causal Connection Between the Stewart Plaintiffs' Mold Exposure and their Health Problems Are Unreliable, Unsupported, and Contradicted by the Evidence in this Case.**

10.     In each of his reports related to members of the Stewart family, Dr. Walcott attempts to minimize the health hazards posed by mold exposure and attempts to ascribe the Stewart plaintiffs' mold-related symptoms to anything other than mold found inside the home, i.e., outdoor or atmospheric mold exposure, other allergens, or other health conditions for which family members may have exhibited similar symptoms before or after their years at Keesler. But these attempts to deny a causal link between residential mold exposure and the Stewart plaintiffs' injuries are speculative and conclusory, and not based on any meaningful medical or scientific methodology or evidence.

**1.     Dr. Walcott's Medical Assessments of Each of the Stewart Plaintiffs**

**a.     Cody Stewart**

11.     According to Dr. Walcott's report summarizing Cody Stewart's medical history, Mr. Stewart, age 46, has had "chronic nasal symptoms" throughout his life, but without any history of asthma or lower respiratory infections as a child. Exhibit 1, *Walcott Report – Cody Stewart*, at 3. A skin allergy test taken at least twenty years ago indicated a positive reaction to seafood. Id. Dr. Walcott also relies upon the fact that Mr. Walcott had an aeroallergen skin test which showed allergies to "trees, grasses, weeds, cats, and possibly dogs" – but Dr. Walcott does not state when this test was performed, or whether it tested for any mold allergies. Id. at 3-4. Dr. Walcott also notes Mr. Stewart was exposed to a "burn pit" while in Afghanistan which may have been

6

related to a temporary cough which persisted for several months after his tour, but provides no information as to what chemicals to which he was exposed or its relevance, if any, to his allergy symptoms related to mold or other irritants. At some point, Mr. Stewart was diagnosed with allergic rhinitis and a cough which was "contributed to by untreated allergies/post-nasal drip." Id. at 5.

12. The evidence shows Mr. Stewart resided in military housing on Keesler AFB from August 2014 to November 2015; during that time, Mr. Stewart reported nasal and respiratory symptoms consistent with mold exposure, and with other allergic exposures he had suffered in the past. Id. Dr. Wallace points to the fact that Mr. Stewart apparently had "mold testing once and it was negative," but gives no information as to when or how that test was conducted or what molds were tested. Id.

    **b.    Amy Stewart**

13. Amy Stewart, age 45, never had an allergy evaluation, though she reported what Dr. Wallace describes as a "long history of chronic nasal symptoms" which were treated with over-the-counter medicine such as Benadryl. Exhibit 1, *Walcott Report – Amy Stewart*, at 3. While at their residence at Keesler, Ms. Stewart reported increased postnasal drip, headaches, and joint pain. Id. at 4. Dr. Walcott's report details other health issues Ms. Stewart may have encountered both before and after her time at Keesler (e.g., allergic reactions to bee stings, increased heart palpitations, vitamin D deficiency, and a recent diagnosis of lupus erythematosus and other ailments), all of which lead Dr. Walcott to conclude that neither her current health problems nor her allergy symptoms while at Keesler were caused by residential mold exposure.

### c. Faith Stewart

14. Faith Stewart, age 21, reported nasal symptoms throughout her childhood as well as a single respiratory infection at the age of 14 or 15; these appear to have been managed by nasal rinses, Allegra, and nebulizers, respectively. Exhibit 1, *Walcott Report – Faith Stewart*, at 3. Even if Ms. Stewart has never had an allergy test, Dr. Walcott surmises, without any documentation, that her symptoms are "suggestive of allergic dysfunction" and speculates that because she is symptomatic around cats, "she may be allergic to other allergens, including dust mites…" Id. at 4. Importantly, Dr. Walcott did not have medical records to review for Ms. Stewart, but still was willing to opine that her history of symptoms at Keesler "suggests that her symptoms are usual infections, not excessive infections as one might expect in someone who is mold allergic and lives in an indoor environment with excessive documented mold exposure, as compared to the outdoor mold levels." Id. at 4. This statement is rife with speculation, given that Dr. Walcott has no medical records and no knowledge of the mold levels inside or outside the Stewart's Keesler residence.

### d. Clayton Stewart

15. From an interview with Clayton Stewart, age 18, and his parents, Dr. Walcott reports various respiratory or allergic symptoms from Mr. Stewart's childhood, whether those symptoms were merely seasonal allergies, various nasal symptoms, or even a single upper respiratory infection as a toddler. Exhibit 1, *Walcott Report – Clayton Stewart*, at 3-4. Importantly, Mr. Stewart has never undergone any allergy testing to determine if he is allergic to any substances, including mold or any other known allergens. And as stated above, Dr. Walcott had no record of mold testing performed on the Stewart residence at the time they lived on Keesler. From this information (or lack thereof), along with a review of medical records, Dr. Walcott concludes that

even if Mr. Stewart reported symptoms consistent with mold exposure, those symptoms were not caused by residential exposure to mold.

    **2.    Dr. Walcott's Conclusions are Identical for Each Plaintiff in Denying Any Causal Link Between Their Injuries and their Residential Mold Exposure**

16.    Taken as a whole, Dr. Walcott appears to acknowledge that various members of the Stewart family suffered from symptoms associated with mold allergies, including nasal and respiratory problems, headaches, etc. during the time they lived in their home on Keesler AFB. The record indicates several of the family members had not undergone allergy testing, either at all or specific to mold allergies, but Dr. Walcott improperly uses this lack of information to negate the possibility that they could be allergic to mold, rather than concluding that any of them could have had an undetected mold allergy. Similarly, Dr. Walcott repeatedly notes that there was no mold testing performed on the Stewart residence while they were living there between August 2014 and November 2015 (but he does not address any mold studies on that house which may have been performed either prior to or subsequent to that time period). Again, Dr. Walcott uses the lack of information to inform a speculative opinion that the Stewarts were not exposed to any mold in their residence, and certainly not to any elevated levels which could cause or exacerbate their allergic symptoms.

17.    Dr. Walcott's attempts in his report to minimize the health hazards posed by mold exposure generally, and to the Stewart plaintiffs specifically, fly in the face of the documentary evidence produced by Defendants in discovery in this case concerning the dangers of mold. Defendants routinely disseminated information to residents, including the Stewart plaintiffs, regarding the health hazards associated with mold, just as they disseminated training materials to their respective employees regarding the proper protocol for addressing mold clean-up and mold

remediation problems. For example, Dr. Walcott's report contains the following quote he attributes to the website for the Center for Disease Control and Prevention:

> "The term 'toxic mold' is not accurate. While certain molds are toxigenic, meaning they can produce toxins, (specifically mycotoxins), the molds themselves are not toxic or poisonous. Hazards presented by molds that may produce mycotoxins should be considered the same as other common molds which can grow in your house. There's always a little mold everywhere – in the air and on many surfaces. There are very few reports that toxigenic molds found inside homes can cause unique or rare health conditions such as pulmonary hemorrhage or memory loss. These case reports are rare, and a causal link between the presence of the toxigenic mold in these conditions has not been proven."

Id. at 3. Dr. Walcott's report contains no citation to the CDC website, making it impossible to determine: (1) the accuracy of the quote; (2) the context in which it was presented (i.e., whether intended as a simplified, lay summary or a statement of scientific fact with underlying supporting data, etc.); or even: (3) basic identifying information such as the author of the quote or the date on which such information was published.

18. As an initial matter, because Dr. Walcott is not a toxicologist and has no apparent background in toxicology, he should not be permitted to simply parrot opinions regarding the toxicity of mold from an uncited quotation purportedly from the CDC website. *See, e.g., Zellars v. NexTech Northeast, LLC,* 895 F.Supp.2d 734, 743-44 (E.D. Va. 2012)(excluding opinions as to toxicity of refrigerant offered by physician with expertise in internal medicine and pediatrics, when no evidence her expertise extended to "toxicology, chemical exposure, or specifically, exposure to refrigerants," particularly when same doctor referred her patients with toxic mold exposure to a toxicologist for diagnosis and treatment).

19. Moreover, while Federal Rule of Evidence 703 does not require that the underlying data supporting an expert's opinion to be itself admissible, Dr. Walcott's blanket recitation of alleged language from the CDC website, without any supporting citation or discussion, is too thin a reed upon which his opinions to rest, particularly when other documentary evidence produced by

Defendants contradicts his position regard the dangers of mold exposure. *See, e.g., Arkema*, 685 F.3d at 467 (excluding expert opinion which relied on "blanket statements from presumably credible sources—such as material safety data sheets and advisory guidelines—but failed to present the scientific evidence upon which those statements were founded"). For example, Dr. Walcott's opinions minimizing the dangers of mold are directly contradicted by materials disseminated by Defendants to its own staff or to military housing residents, including Plaintiffs. For example, Defendants acknowledged:

- "some common molds have been linked to allergic reactions and more serious illnesses, so it is a good idea to eliminate all mold growth from the indoor environment;"
- "both dead and living mold can produce allergic and even toxic reactions in sensitive individuals;"
- typical allergenic reactions from airborne mold exposure include: respiratory problems, nasal and sinus congestion, eye irritation, dry cough, or nose or throat irritation.

**Exhibit 2**, *Mold Awareness Training: Awareness Training for All On-Site Associates*, at 1-2 (FRCM00001609); **Exhibit 3**, *Mold & Mildew: Mold Awareness for Residents of Our Apartment Community*, at 1-2 (FCRM00000096). Another document, entitled *What You Should Know About Mold*, acknowledged similar health effects (e.g., respiratory problems, congestion, cough, nose/throat irritation, etc.), as well as more severe symptoms (including headaches, body aches, memory problems, etc.) in extreme cases. **Exhibit 4**, *What You Should Know About Mold*, at 1 (Hunt – Gen05-00812). These same materials acknowledge that individuals with existing respiratory conditions, weakened immune systems, or certain age groups (i.e., infants, children, or the elderly) are the most susceptible to these adverse affects. Exhibit 2, at 1-2; Exhibit 3, at 1-2; Exhibit 4, at 1. Underscoring the potential hazards to affected individuals, Defendants' literature to residents specifically instructs them to contact a primary care physician upon any suspicion of health problems related to mold. Exhibit 4, at 2 (Hunt - Gen05 – 00812-13).

11

20.     Again, Dr. Walcott speculates that "even if the symptoms [plaintiffs] reported could be attributed to mold, the symptoms cannot be attributed to mold in the home because these same molds are common everywhere, and the Stewarts had no testing in their home to determine what, if any, mold was actually inside their home."  <u>See, e.g.,</u> <u>Exhibit 1</u>, *Walcott Report – Cody Stewart*, at 5.  Again, it is unclear to what "common" molds Dr. Walcott is referring, or how he can reach the conclusion that indoor molds did not cause or exacerbate their symptoms when he does not even know what mold was present.  To the extent that any indoor mold was present, his opinions regarding their potential hazard is contradicted by Defendants' documents, which contained admonitions such as:  "If <u>any kind of mold is found growing indoors, it needs to be approached with caution and cleaned up by somebody</u>;" (recommending "trained on-site staff wearing protective equipment" for small projects, and hiring outside professionals for larger projects).  <u>Exhibit 2</u>, at 2-3 (emphasis added); <u>compare</u> <u>Exhibit 3</u>, at 3 (referencing the need for protective equipment or the use of professionals, but curiously *omitting* the "needs to be approached with caution" language in the handout to residents and instead assuring them that mold cleanup is "not a hazardous task").

21.     As discussed above, Dr. Walcott regularly attributes the Stewart plaintiffs' symptoms to preexisting conditions, atmospheric allergens, or other allergens such as pets or unspecified dust mites.  He goes on to opine that none of the Stewart plaintiffs' health symptoms or their medical treatment were related to mold exposure from inside the residence.  Similarly, he rejects the possibility that any of their preexisting symptoms were aggravated or exacerbated by the presence of mold inside the residence.  He offers no methodology, no references, or no testable, verifiable scientific basis for his opinions, other than the fact that he does not believe there is a causal connection.  This type of *ipse dixit* expert opinion is not permitted under *Daubert* or its

progeny. *Arkema*, 685 F.3d at 467, *quoting General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

## IV.  CONCLUSION & PRAYER

For the reasons set forth above, the Stewart Plaintiffs respectfully request the Court GRANT Plaintiffs' Motion to Strike the Opinions and Testimony of Dexter Winn Walcott, MD. Plaintiffs further request any additional relief to which they are entitled in law or equity.

Respectfully submitted this the 10th day of May, 2019.

                                                            RUSHING & GUICE, P.L.L.C.
                                                            Attorneys for Plaintiffs

BY:   /s/ *Maria Martinez*
        MARIA MARTINEZ MSBN 9951
        WILLIAM LEE GUICE III MSBN 5059
        R. SCOTT WELLS MSBN 9456
        P.O. BOX 1925
        BILOXI MS  39533-1925
        Voice: 228-374-2313   Fax: 228-875-5987
        mmartinez@rushingguice.com
        bguice@rushingguice.com
        swells@rushingguice.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which sent notification of such filing to all counsel of record.

SO CERTIFIED this the 10th day of May, 2019.

>*/s/ Maria Martinez*
> MARIA MARTINEZ