**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| CODY STEWART, AMY STEWART AND<br>FAITH STEWART AND CLAYTON STEWART,<br>MINORS, BY AND THROUGH THEIR NATURAL<br>GUARDIANS, CODY STEWART AND AMY STEWART | **PLAINTIFFS** |
| **VERSUS** | **CAUSE NO. 1:18-cv-00053-HSO-JCG** |
| HUNT SOUTHERN GROUP, LLC FKA<br>FOREST CITY SOUTHERN GROUP, LLC,<br>FOREST CITY RESIDENTIAL MANAGEMENT, LLC,<br>UNKNOWN JOHN and JANE DOES A THROUGH M, AND<br>OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z | **DEFENDANTS** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO [207] DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DR. PAUL GOLDSTEIN AND [205] DEFENDANTS' MOTION TO STRIKE/EXCLUDE SUPPLEMENTAL DESIGNATION AND SUPPLEMENTAL REPORT OF DR. PAUL GOLDSTEIN**

COME NOW Plaintiffs, by and through their undersigned counsel of record, Rushing & Guice, P.L.L.C., and files this, their Response in Opposition to [207] Defendants' Motion to Exclude the Opinions and Testimony of Dr. Paul Goldstein and [205] Defendants' Motion to Strike/Exclude Supplemental Designation and Supplemental Report of Dr. Paul Goldstein, and would further request the Court permit a hearing or oral argument of this matter pursuant to local rule L.U.Civ.R.7(b)(6), and in support thereof would show unto the Court the following:

**INTRODUCTION**

1. Plaintiffs herein are a military family who obtained housing in privatized housing located on or around Keesler Air Force Base in Biloxi, Mississippi. This housing was leased from Defendants in their various capacities as owners or managers of the properties and pursuant to the terms of said lease, Plaintiffs' rent was paid through the housing allowance provided

1

pursuant to the compensation plan available to members of the United States military. Plaintiffs resided in said privatized housing during the years of 2014-2015.

2. Plaintiffs contend that, while residing in the privatized housing, they were exposed to unhealthy conditions and various aspects of mold and mildew and other housing inadequacies which made the premises uninhabitable and which affected them adversely, and they attribute various symptoms, conditions, and injuries to this exposure, which are described as follows: Allergic rhinitis; hypothesia of skin; fatigue; seborrheic dermatitis; migraine; conjunctivitis; itching, allergic reaction; nausea; abdominal cramping; skin rash; upper respiratory tract disease; congestion; nasal drainage; dermatological disorder; keratosis; and pharyngitis.. See **Exhibit "A"** at pg. 2-3.

3. During the course of this litigation, Plaintiffs, through their counsel, retained Paul Goldstein, Ph.D., a toxicology and forensic expert residing in El Paso, Texas who is a full professor at the University of Texas at El Paso in the department of biological sciences. He has a teaching and research focus in the areas of toxicology and genetics.

4. Dr. Goldstein was provided the following materials which were utilized in the preparation of his initial report and which he identified therein: (1) medical records of the Foster home, and (2) Plaintiffs' pre-discovery disclosure core information. He also received information regarding other plaintiffs which are identified in the "sister" cases pending before this Court.

5. Dr. Goldstein was designated as an expert witness on behalf of the plaintiffs within the time limits prescribed by the court and Dr. Goldstein's C.V. as well as an expert report prepared by Dr. Goldstein was served upon all counsel of record on August 24, 2018. A copy of Dr. Goldstein's C.V. is attached hereto as **Exhibit "B"**, and the initial report submitted by Dr. Goldstein is attached hereto as Exhibit "A". The report stated the following:

The following symptoms were diagnosed, but not limited to, the individuals living in the Stewart's residence: Allergic rhinitis; hypothesia of skin; fatigue; seborrheic dermatitis; migraine; conjunctivitis; itching, allergic reaction; nausea; abdominal cramping; skin rash; upper respiratory tract disease; congestion; nasal drainage; dermatological disorder; keratosis; and pharyngitis.

The occurrence of some, if not all, of these symptoms are positively correlated with toxic exposure to the following pathogens, which were identified in the residences found in the immediate area:

**Aspergillus/Penicillium-Like**
This category is included on laboratory analysis reports for air samples containing certain free spores without other identifying structures. The free spores of *Aspergilus* and *Penicillium* (and other genera with small, round or ovoid, and colorless spores) are essentially indistinguishable, using standard microscopic examination methods.

If required, cultured specimens can provide additional characteristics that will enable technicians to determine what genus is represented. If sporulating structures are present, *Aspergillus* is readily identifiable on tape samples. [Discovery of the *Aspergillus* species requires the culture of the fungus under different conditions of media, humidity, and temperature. Identifying *Penicillium* species is difficult, but, in some cases, possible.]

These two allergenic molds are among those most often found in contaminated buildings. *Aspergillus* is represented by numerous species, many of which produce toxic substances. It may be associated with symptoms such as sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms. As if not to be outdone, *Penicillium* too is found in increased numbers in interiors. Some of its many species produce toxic substances that can cause allergic reactions, mucous membrane irritation, headaches, vomiting, and diarrhea.

**Aspergillus**
Reported to be allergenic. Members of this genus are reported to cause ear infections. Many species produce mycotoxins that may be associated with disease in humans and other animals. Toxin production is dependent on the species or a strain within a species and on the food source for the fungus. Some of these toxins have been found to be carcinogenic in animal species. Several toxins are considered potential human carcinogens. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema; may also be associated with sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms.

**Penicillium**
A wide number of organisms have been placed in this genus. Identification to species is difficult. Often found in aerosol samples. Commonly found in soil, food, cellulose and grains. It is also found in paint and compost piles. It may cause hypersensitivity pneumonitis, allergic alveolitis in susceptible individuals. It is reported to be allergenic (skin). It is commonly found in carpet, wallpaper, and in interior fiberglass duct insulation. Some species can produce mycotoxins. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema. It may also cause headaches, vomiting, and diarrhea.

**Stachybotrys**
Several strains of this mold (S. atra, S. chartarum, and S. alternans are synonymous) may produce macrocyclic trichothecenes (one of which is Satratoxin H) that are poisonous by inhalation. These mycotoxins, when present, are primarily associated with the mold's spores.

Individuals with chronic exposure to *Stachybotiys's* toxins reported cold and flu symptoms, sore throats, diarrhea, headaches, fatigue, dermatitis, hair loss, general malaise, and psychological depression. For infants, the toxins create a vulnerability to a serious condition called pulmonary hemosiderosis (bleeding in the lungs) where severe bleeding can result in coughing blood or nosebleeds, and low grade bleeding can cause chronic coughs and congestion with anemia. People who unknowingly handled material contaminated with this mold described symptoms of cough, rhinitis, burning sensations of the mouth and nasal passages, and cutaneous irritation at the point of contact, especially in areas of abundant perspiration. The toxins produced by this mold will suppress the immune system, affecting the lymphoid tissue and the bone marrow. Animals injected with macrocyclic trichothecenes exhibited the following symptoms: necrosis and hemorrhage within the brain, thymus, spleen, intestines, lung, heart, lymph nodes, liver, and kidneys.

This is a dark-colored fungus that grows on building materials with a high cellulose content and a low nitrogen content. It is slow growing when compared to other common molds, and may not appear to compete well in their presence. Yet, when moisture levels are high for prolonged periods, Stachybotiys may gradually become the dominating genus (possibly because of its yield of mycotoxins, which are believed to be directed against other molds and bacteria). This organism is usually difficult to find in indoor air samples unless it is physically disturbed, but when it does appear it is an alert to find the source, as it will likely be found growing in abundance. Its spores--which can be found in a gelatinous mass--will die readily after release, but are still allergenic and can be toxigenic. Areas with a relative humidity above 55%, and are subject to temperature fluctuations, are ideal for toxin production.

**Mold Allergy**
Most allergic responses to mold involve hay fever-type symptoms that can make you miserable but aren't serious. However, certain allergic conditions caused by mold are more severe. These include, but are not limited to (Mayo Clinic, 2018):

• **Mold-induced asthma.** In people allergic to mold, breathing in spores can trigger an asthma flare-up. If you have a mold allergy and asthma, be sure you have an emergency plan in place in case of a severe asthma attack.
• **Allergic fungal sinusitis.** This results from an inflammatory reaction to fungus in the sinuses.
• **Allergic bronchopulmonary aspergillosis.** This reaction to fungus in the lungs can occur in people with asthma or cystic fibrosis.
• **Hypersensitivity pneumonitis.** This rare condition occurs when exposure to airborne particles such as mold spores causes the lungs to become inflamed. It may be triggered by exposure to allergy-causing dust at work.

**Ochratoxin A**
Individuals exposed to *Aspergillus* and *Penicillium* in their homes are exposed to the mycotoxin Ochratoxin A (OTA). It is a known nephrotoxic, immunotoxic, and carcinogenic mycotoxin in animals and is present with elevated levels of *Aspergillus* and *Penicillium* (Hope and Hope, 2012). It is classified as a class 2B, possible human carcinogen by IARC. The National Toxicology Program (NTP) has designated OTA as a "reasonably anticipated to be human carcinogen". DNA adducts occur in animals exposed to OTA which interfere with the DNA repair systems and cell cycle control systems and serve as an initiating point of carcinogenesis (Hope and Hope, 2012).

In humans, OTA has been detected in blood, urine, and breast milk, as well as renal cell carcinomas, breast cancer, astrocytoma, inflamed bladder tissue, cell carcinoma, and skin biopsies. In addition, OTA has been found in the umbilical cord and placental tissue of a newborn whose mother had been exposed from a water-damaged home. The mother had OTA in her breast milk, urine, and nasal secretions. Other family members also tested positive for OTA in urine and nasal secretion samples (Hope and Hope, 2012).

See Exhibit "A" at pg. 2-5.

Furthermore, as can be seen above, Dr. Goldstein identified certain pathogens which were identified as being present in residences in the immediate area of the Stewart residence and described those pathogens and the likely effects from being exposed to said pathogens. He also described and discussed mold allergies as well as the mycotoxin Ochratoxin A, which is affiliated with Apsergillus and Penicillium exposure. See Exhibit "A" at pg. 5.

6. Dr. Goldstein thereafter indicated that with at least a 51% probability he believes that the residents of the household were exposed to and suffered from toxins released by the presence of Aspergillus and Penicillium in their home. This conclusion was based upon the fact that upon review of the information provided, there is evidence that such pathogens existed in homes in the immediate area, that such pathogens are known to cause certain effects and symptoms with persons who are exposed to the pathogens, and the plaintiffs did in fact suffer such conditions and symptoms. Furthermore, as indicated in Dr. Goldstein's supplemental report, he had obtained the benefit of depositions taken in this matter, questionnaires filled out by Plaintiffs, and the reports of other experts. Using these materials, he essentially confirmed his original opinions and further illustrated his analysis of the matter and the details related to his conclusions.

7. Dr. Goldstein's report identified certain source material used by Dr. Goldstein, including certain resource materials credited to Bradford-Hill, D. Friedman and J. and B. Hope. Dr. Goldstein also indicated that certain source material was from the Mayo Clinic, 2018, and, as previously stated, that he received and utilized certain other materials received from Plaintiffs' counsel.

8. As a matter of background, and as evidence that he was qualified to address these issues, Dr. Goldstein's report identified his educational background, numerous publications authored by Dr. Goldstein, thesis and dissertation material by Dr. Goldstein, education related science articles by Dr. Goldstein, historical publications by Dr. Goldstein, numerous papers presented by Dr. Goldstein, professional societies and editor positions held by Dr. Goldstein (including but not limited to the Society of Toxicology wherein he is currently a full member), certain copyrights obtained by Dr. Goldstein (including a toxicology multimedia program with internet applications

dated 2005), certain honors received by Dr. Goldstein, teaching experience of Dr. Goldstein (which includes classes on toxicology and related fields), employment history of Dr. Goldstein (which indicates that he has been a University professor or teacher of some type since the early 1970's), numerous grants received by Dr. Goldstein, and the actual report of Dr. Goldstein which includes a description, a narrative of his qualifications, information regarding prior testimony, identification of materials and data considered or relied upon, compensation, and a statement regarding his opinions and information regarding certain issues and substances which are relevant to this case and which require an expert scientific explanation in order for a jury or other to understand the effects of exposure to certain pathogens.

9. Dr Goldstein's report was subsequently supplemented as follows: On February 7, 2019 Plaintiffs filed their Supplemental Designation of Expert Witness wherein Dr. Goldstein's C.V. and deposition/trial testimony history were updated, see **Exhibit "C"** attached. On March 6, 2019 Plaintiffs submitted their Supplemental Designation of Expert Witness wherein Dr. Goldstein provided a list of additional documentation that supported his conclusions. See **Exhibit "D"** attached. On March 21, 2019 Plaintiffs submitted their Supplemental Designation of Expert Witness wherein Dr. Goldstein's Supplemental Report was provided, see **Exhibit "E"** attached. Additionally, Dr. Goldstein was deposed by the defendants on December 18-19, 2018, see **Exhibits "F" and "G"** attached.

## EXPERT TESTIMONY

10. Expert testimony is allowed under Federal Rule of Evidence 702. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The opinions expressed by Dr. Goldstein, in his report, deposition and supplemental materials, address issues regarding certain substances found within the home of the plaintiffs and in residences in the immediate area, the effects of such substances when an individual is exposed to such substances, and the likelihood as to whether such substances contributed to or caused the conditions complained of by the plaintiffs. These separate opinions and statements regarding these substances are contained within Dr. Goldstein's original report, which was filed within the time limits directed by the court.

11. Subsequent to the submission of this expert report, Defendants deposed Dr. Goldstein, and during the course of said deposition, explored the various opinions and comments and informational testimony which might be presented by Dr. Goldstein at the trial of this matter. In the course of said deposition, it was determined that additional materials support Dr. Goldstein's opinions and statements which were presented in his original report and it was requested that such materials be identified. Additionally, Dr. Goldstein explained and clarified the statements and various opinions contained within his report and addressed such in greater depth than was previous presented, all of which fell within the scope of the disclosures contained in the original report. Dr. Goldstein explained his opinions, explained information he had obtained and reviewed from his experience and background in toxicology and regarding various molds, and indicated that he could provide additional materials which would support his various opinions which practically all related to generally accepted scientific principles. As stated in *Moore v. Ashland Chemical Inc.*, 151 F.3d 275 (5th Cir., 1998):

> The primary locus of this obligation is Rule 702, which clearly contemplates
> some degree of regulation of the subjects and theories about which an expert may

testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto. " The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Daubert, 509 U.S. at 589-90, 113 S.Ct. at 2794-95 (emphasis in original) (internal citations omitted).

The Court stated further that:

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

Id. at 591, 113 S.Ct. at 2795 (citation omitted). The Court then proceeded to enumerate a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. Id. at 593-95, 113 S.Ct. at 2796-97.

12. In response to Dr. Goldstein's representations during the deposition that he could obtain and provide additional documentation regarding the information provided in his report, Dr. Goldstein subsequently provided an extensive list of research materials and scientific data which specifically supported various statements made during the course of his deposition. Additionally, shortly thereafter, Dr. Goldstein provided a supplemental report which addressed statements made by Defendants' expert as well as expanded and clarified many of the discussions which took place during the deposition of Dr. Goldstein, and which were presented in his original

report. The supplemental document identified additional materials received by Dr. Goldstein for review and did not expand the scope of Dr. Goldstein's testimony. Defendants were on notice from the doctor's initial report as to the subject matter of all discussions contained therein.

13. The Defendants seek to use every conceivable argument for excluding Dr. Goldstein's testimony, whether those opinions related to causation, whether they related to correlation of the exposure to certain toxins and pathogens and the symptoms experienced by the plaintiffs, and whether any additional information which may be presented by Dr. Goldstein at the trial of this matter may educate and inform the jury regarding generally accepted scientific principles related to exposure to pathogens, such being beyond the knowledge ordinarily known by laymen.

## DR. GOLDSTEIN IS QUALIFIED TO TESTIFY REGARDING THE MATTERS CONTAINED IN HIS EXPERT REPORT

14. Dr. Goldstein is qualified to offer opinions and testimony regarding pathogens, likely effects of exposure to said pathogens, and likelihood that said exposure caused or contributed to the symptoms experienced by the plaintiffs herein. While it is true that Dr. Goldstein's Masters and Doctorate degrees which were obtained in the 1970's were not in the field of toxicology, it also has been indicated that such degrees were not available in the time period he attended school and that he in fact expanded his education while a professor and pursued additional learning within the field of toxicology, which he then taught in a university setting. Dr. Goldstein's resume provides a detailed picture of the experience and education of this gentleman and his involvement in the field of toxicology and genetics, including but not limited to his full membership in the Society of Toxicology. Dr. Goldstein is more than qualified to testify regarding the subject matter of his report, and, should the court wish to further explore Dr. Goldstein's background experience in the field of toxicology, it would be appropriate for the

court to conduct a hearing regarding same whereby Dr. Goldstein can present the details of his experience and education directly to the Court so that his credentials may be further evaluated.

15. Rule 702 does not require the extreme expertise that the Defendants seem to seek. *See Tesco Corp. v. Weatherford International, Inc.,* 2010 WL 4627807, at *10 (S.D. Tex. Sept. 27, 2010). "A witness qualified as an expert is not strictly confined to his area of practice but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.* (citing *Trenado v. Cooper Tire & Rubber Co.*, 2009 WL 5061775, at *2 (S.D. Tex. Dec. 15, 2009) (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir. 1990), abrogated on other grounds by *Little v. Liquid Air. Corp.*, 37 F.3d 1069 (5th Cir. 1996)); *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1431 (5th Cir. 1989).

16. Dr. Goldstein's opinions are reliable. Dr. Goldstein is not offered as a fact witness as to the existence of any such pathogens in the home of the plaintiffs, but rather, he has indicated that he has relied upon all information provided to him as well as statements made by the plaintiffs, and the plaintiffs' medical reports. He subsequently received numerous depositions and other materials obtained during the course of this litigation. Dr. Goldstein has stated that when one is in the presence of, and exposed to, such pathogens, certain effects tend to lie which are scientifically documented and which are as follows:

> **Aspergillus/Penicillium-Like**
> This category is included on laboratory analysis reports for air samples containing certain free spores without other identifying structures. The free spores of *Aspergilus* and *Penicillium* (and other genera with small, round or ovoid, and colorless spores) are essentially indistinguishable, using standard microscopic examination methods.
>
> If required, cultured specimens can provide additional characteristics that will enable technicians to determine what genus is represented. If sporulating structures are present, *Aspergillus* is readily identifiable on tape samples.

11

[Discovery of the *Aspergillus* species requires the culture of the fungus under different conditions of media, humidity, and temperature. Identifying *Penicillium* species is difficult, but, in some cases, possible.]

These two allergenic molds are among those most often found in contaminated buildings. *Aspergillus* is represented by numerous species, many of which produce toxic substances. It may be associated with symptoms such as sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms. As if not to be outdone, *Penicillium* too is found in increased numbers in interiors. Some of its many species produce toxic substances that can cause allergic reactions, mucous membrane irritation, headaches, vomiting, and diarrhea.

### **Aspergillus**
Reported to be allergenic. Members of this genus are reported to cause ear infections. Many species produce mycotoxins that may be associated with disease in humans and other animals. Toxin production is dependent on the species or a strain within a species and on the food source for the fungus. Some of these toxins have been found to be carcinogenic in animal species. Several toxins are considered potential human carcinogens. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema; may also be associated with sinusitis, allergic bronchopulmonary aspergillosis, and other allergic symptoms.

### **Penicillium**
A wide number of organisms have been placed in this genus. Identification to species is difficult. Often found in aerosol samples. Commonly found in soil, food, cellulose and grains. It is also found in paint and compost piles. It may cause hypersensitivity pneumonitis, allergic alveolitis in susceptible individuals. It is reported to be allergenic (skin). It is commonly found in carpet, wallpaper, and in interior fiberglass duct insulation. Some species can produce mycotoxins. Common cause of extrinsic asthma (immediate-type hypersensitivity: type I). Acute symptoms include edema and bronchospasms; chronic cases may develop pulmonary emphysema. It may also cause headaches, vomiting, and diarrhea.

### **Stachybotrys**
Several strains of this mold (S. atra, S. chartarum, and S. alternans are synonymous) may produce macrocyclic trichothecenes (one of which is Satratoxin H) that are poisonous by inhalation. These mycotoxins, when present, are primarily associated with the mold's spores.

Individuals with chronic exposure to *Stachybotiys's* toxins reported cold and flu symptoms, sore throats, diarrhea, headaches, fatigue, dermatitis, hair loss, general malaise, and psychological depression. For infants, the toxins create a vulnerability to a serious condition called pulmonary hemosiderosis (bleeding in the lungs) where severe bleeding can result in coughing blood or nosebleeds, and

low grade bleeding can cause chronic coughs and congestion with anemia. People who unknowingly handled material contaminated with this mold described symptoms of cough, rhinitis, burning sensations of the mouth and nasal passages, and cutaneous irritation at the point of contact, especially in areas of abundant perspiration. The toxins produced by this mold will suppress the immune system, affecting the lymphoid tissue and the bone marrow. Animals injected with macrocyclic trichothecenes exhibited the following symptoms: necrosis and hemorrhage within the brain, thymus, spleen, intestines, lung, heart, lymph nodes, liver, and kidneys.

This is a dark-colored fungus that grows on building materials with a high cellulose content and a low nitrogen content. It is slow growing when compared to other common molds, and may not appear to compete well in their presence. Yet, when moisture levels are high for prolonged periods, Stachybotiys may gradually become the dominating genus (possibly because of its yield of mycotoxins, which are believed to be directed against other molds and bacteria). This organism is usually difficult to find in indoor air samples unless it is physically disturbed, but when it does appear it is an alert to find the source, as it will likely be found growing in abundance. Its spores--which can be found in a gelatinous mass--will die readily after release, but are still allergenic and can be toxigenic. Areas with a relative humidity above 55%, and are subject to temperature fluctuations, are ideal for toxin production.

## Mold Allergy
Most allergic responses to mold involve hay fever-type symptoms that can make you miserable but aren't serious. However, certain allergic conditions caused by mold are more severe. These include, but are not limited to (Mayo Clinic, 2018):
- **Mold-induced asthma.** In people allergic to mold, breathing in spores can trigger an asthma flare-up. If you have a mold allergy and asthma, be sure you have an emergency plan in place in case of a severe asthma attack.
- **Allergic fungal sinusitis.** This results from an inflammatory reaction to fungus in the sinuses.
- **Allergic bronchopulmonary aspergillosis.** This reaction to fungus in the lungs can occur in people with asthma or cystic fibrosis.
- **Hypersensitivity pneumonitis.** This rare condition occurs when exposure to airborne particles such as mold spores causes the lungs to become inflamed. It may be triggered by exposure to allergy-causing dust at work.

## Ochratoxin A
Individuals exposed to *Aspergillus* and *Penicillium* in their homes are exposed to the mycotoxin Ochratoxin A (OTA). It is a known nephrotoxic, immunotoxic, and carcinogenic mycotoxin in animals and is present with elevated levels of *Aspergillus* and *Penicillium* (Hope and Hope, 2012). It is classified as a class 2B, possible human carcinogen by IARC. The National Toxicology Program (NTP) has designated OTA as a "reasonably anticipated to be human carcinogen". DNA adducts occur in animals exposed to OTA which interfere with the DNA repair

systems and cell cycle control systems and serve as an initiating point of carcinogenesis (Hope and Hope, 2012).

In humans, OTA has been detected in blood, urine, and breast milk, as well as renal cell carcinomas, breast cancer, astrocytoma, inflamed bladder tissue, cell carcinoma, and skin biopsies. In addition, OTA has been found in the umbilical cord and placental tissue of a newborn whose mother had been exposed from a water-damaged home. The mother had OTA in her breast milk, urine, and nasal secretions. Other family members also tested positive for OTA in urine and nasal secretion samples (Hope and Hope, 2012).

See Exhibit "A" at pg. 3-5.

17. This information is generally accepted in the scientific community and in the field of toxicology. Dr. Goldstein is competent to reliably testify regarding the possible effects resulting from exposure to these pathogens. Dr. Goldstein's testimony that exposure to any such pathogens may therefore result in the known likely symptoms and effects of exposure to such pathogens is reliable and conforms with general scientific principles, and he can further confirm that certain symptoms and effects experienced by Plaintiffs match these known effects. Although Defendants assert that no materials were provided which support these propositions, Dr. Goldstein cited two resources in the above-quoted material. He also received similar material regarding each plaintiff in the "sister" cases pending before this Court. The statements and opinions of Dr. Goldstein utilized generally accepted principles and Dr. Goldstein provided additional documentation verifying same when requested to do so. After considering this information, Dr. Goldstein is able to reliably establish general causation. The plaintiffs were exposed to such pathogens and suffered effects known to be common effects and symptoms of such exposure. This scientific information is beyond that knowledge generally possessed by laymen and Dr. Goldstein is competent to reliably testify regarding same. This testimony is relevant to Plaintiffs' asserted causes of action and may be considered by the jury when making factual determinations of various elements such as habitability of the premises and conditions

constituting a breach of contract, even though Defendants have attempted to narrowly define Plaintiffs' causes of actions as a "toxic tort claim." Dr. Goldstein can competently testify regarding exposure and potential symptoms and effects resulting from such exposure. This testimony, although to some degree constituting opinion, is as much educational in nature due to the generally accepted principles utilized in this evaluation, and Dr. Goldstein should be allowed to testify regarding same in order to better inform the jury about these scientific matters.

18. The doctor next indicates that not only does he believe that Plaintiffs were exposed, but he believes that they did suffer from the toxins to which they were exposed. As expressed by Dr. Goldstein during his deposition, although he is unable to determine, beyond doubt, that such exposure resulted in said symptoms, he believes there was at least a 51% chance that at least some of the symptoms experienced by Plaintiffs resulted from their exposure to the mold or pathogens present in their home.

19. Dr. Goldstein's testimony regarding the nature of certain pathogens, and the likely effects of being exposed to such pathogens is scientific, technical or other specialized information which would assist the trier of fact in understanding evidence which they may receive and potential consequences and effects resulting from exposure to such pathogens. For such reason, Dr. Goldstein's testimony regarding same should be presented to the jury. This information should be presented for the education and benefit of the jury in evaluating facts they may hear. Dr. Goldstein is competent to reliably assist the jury in understanding the risks involved with exposure to these conditions, based upon generally accepted principles. This information will help the jury make factual determinations regarding issues such as actual exposure and habitability of the premises, and help them understand that whether or not exposure to these pathogens caused the harms suffered by Plaintiffs, that the exposure and potential exposure to

same still are considerations in making factual determinations related to the various causes of action asserted by Plaintiffs.

20. Dr. Goldstein was presented with numerous tests in the various cases he reviewed that were created and produced by other third parties and which contained descriptions of symptoms and effects which were suffered by the plaintiffs as expressed within their medical records and in information provided by Plaintiffs themselves. He was also presented with copies of depositions when such became available. No additional tests by Dr. Goldstein were required in order for him to present the scientific information which he is able to present to the jury, and present his opinions regarding same, as well as his evaluation of the information presented to him.

21. Dr. Goldstein's testimony is necessary as the jurors should not be expected to know or understand such scientific information on their own. Additionally, Dr. Goldstein, while presenting his testimony, can explain in greater detail why he reached the conclusion that the causation is at least 51% likely for this family as it relates to effects caused by the pathogens. Dr. Goldstein has identified the factual information that he used, he applied generally accepted scientific principles, and he determined, through his expertise in the field of toxicology, that some of the family's ailments were more likely than not caused by the pathogens believed to be present in their home. Of course, he would be subject to cross-examination and competing expert opinions which may or may not affect the jury's evaluation of his credibility.

22. Dr. Goldstein's education, experience and knowledge in the field of toxicology and biology qualifies him to testify regarding the nature of certain pathogens to which the plaintiffs were, or may have been, exposed, the likely effects and symptoms which may result from exposure to said pathogens and toxins, and the likelihood that said symptoms and effects which were experienced and described by Plaintiffs were caused by exposure to such toxins. Each of

these opinions, and Dr. Goldstein's testimony regarding generally accepted scientific information should be allowed. The arguments raised by Defendants regarding potential exclusion of this witness are properly addressed on cross-examination, and with competing testimony, and address the weight to be given to Dr. Goldstein's testimony, and not its admissibility. Furthermore, Defendants are quick to refer to the fact that their expert(s) disagree with Dr. Goldstein. As stated by the United States Fifth Circuit in *Pipotone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir., 2002), experts sometimes reach different conclusions based upon competing versions of the facts and the Court should not exclude an expert's testimony because it believes one version over the other. Additionally, the *Pipitone* Court warned the district court from applying an overly stringent standard of reliability as the fact-finder should have the opportunity to accept or reject an opinion after considering all factors that weigh on credibility, including whether the predicate facts are accurate.

23. The supplemental scientific research material and report submitted regarding Dr. Goldstein are explanatory items which clarify and delve more deeply into the previously disclosed opinions of Dr. Goldstein. Defendants were on notice of the expected testimony of Dr. Goldstein from his initial report and Dr. Goldstein's supplemental report should not be excluded or stricken as the material contained therein falls squarely within the four corners of the information and opinions originally presented, and his confirmation of same following review of the depositions obtained in these cases. In contrast with the position expressed by the defendants in citing *Reliance Ins. Co. v. Louisiana Land and Exploration Co.*, 110 F.3d 253 (5th Cir., 1997) wherein the expert created a completely new opinion addressing new issues which were explicitly not contained in the original report, Dr. Goldstein's supplement only expressed his

original statements and opinions in greater detail than he did in his original report, and in greater detail than was required under Rule 26.

24. If the originally submitted report and the citations contained therein are deemed to be insufficient to support the full scope of Dr. Goldstein's statements and opinions, Plaintiffs request the Court to allow the supplementation of the list of research materials used by Dr. Goldstein as counsel for Plaintiffs first learned that the list of materials might be insufficient during the course of Dr. Goldstein's deposition, and it would be a miscarriage of justice for the plaintiffs to be penalized for such an issue, especially as the alleged absence of material was harmless and the information which was allegedly not identified consisted of generally accepted scientific principles which were readily available to Defendants' experts, and which were essentially already in the possession of the defendants as attachments to the multiple toxicology tests received in the various "sister" cases pending in this Court.

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray that the Court deny Defendant's Motion to Exclude the Testimony and Opinions of Dr. Paul Goldstein, and deny Defendants' Motion to Strike/Exclude Supplemental Designation of Dr. Paul Goldstein, or in the alternative that the Court conduct a hearing on said motion, listen to the testimony of Dr. Goldstein, and then deny Defendants' motions.

Respectfully submitted the 14th day of June, 2019.

RUSHING & GUICE P.L.L.C.

By: */s/ R. Scott Wells*
R. SCOTT WELLS MSBN 9456
WILLIAM LEE GUICE III MSBN 5059
MARIA MARTINEZ MSBN 9951
Post Office Box 1925
Biloxi, Mississippi 39533
Phone: (228) 374-2313
Fax: (228) 875-5987

swells@rushingguice.com
bguice@rushingguice.com
mmartinez@rushingguice.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of June, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

SO CERTIFIED, this 14th day of June, 2019.

/s/ R. Scott Wells
R. SCOTT WELLS

W:\9295\Stewart\Working\Pleadings\19-0613 Response to [207] Motion to Exclude Goldstein's Opinions and Testimony.docx