**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**CODY STEWART, AMY STEWART AND**
**FAITH STEWART AND CLAYTON STEWART,**
**MINORS, BY AND THROUGH THEIR NATURAL**
**GUARDIANS, CODY STEWART AND AMY STEWART**                     **PLAINTIFFS**

**VS.**                                    **CAUSE NO. 1:18-cv00053-HSO-JCG**

**HUNT SOUTHERN GROUP, LLC, fka**
**FOREST CITY SOUTHERN GROUP, LLC,**
**FOREST CITY RESIDENTIAL MANAGEMENT, LLC,**
**UNKNOWN JOHN and JANE DOES A through M,**
**and OTHER UNKNOWN CORPORATE ENTITIES**
**N through Z**                                    **DEFENDANTS**

---

### PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [209]

### INTRODUCTION

Although substandard living conditions in privatized military housing owned by multi-million if not billion-dollar companies whose management philosophies encompass the use of slumlord techniques is prevalent at many military bases, these conditions were especially egregious on Keesler Air Force Base (KAFB). Due in part to the brave men and women servicemembers who spoke out against these owners and managers, this national disgrace is finally garnering the attention it deserves. After several hearings before the Senate Armed Services Committee, the National Defense Authorization Act released earlier this month includes reforms to address how problems at contractor-provided military housing are addressed. The National Defense Authorization Act includes the Ensuring Safe Housing for our Military Act, legislation introduced by the senators in April after a Reuters investigation found hazardous living conditions in privatized military housing throughout the United States, including KAFB.

1

The reforms include withholding basic allowance for housing payments to private housing contractors if a service member and contractor are in dispute over housing conditions and will also withhold incentive fees to contractors if they fail to remedy a health or environmental hazard. It will require contractors to pay for relocation costs if a service member must temporarily leave their home due to an environmental or health hazard, will require housing contractors to offer service members access to their electronic work order systems so that tenants can track the progress of their requests and will require the development of common credentials across the military for health and safety inspectors. **Exhibit 26.**

Additionally, all four military services of the U.S. Department of Defense are preparing a joint Tenant Bill of Rights in an effort to ensure service members and their families have safe, quality homes and communities, and clear rights while living in them. It is intended to increase the accountability of privatized housing companies by putting more oversight authority in the hands of local military leaders.

Instead of devoting his entire energy to the defense of our country, Plaintiff Cody Stewart found himself unable to focus on his mission but instead worrying about his home and family due to the presence of recurring mold in military housing on KAFB caused by Defendants' failures. Until these proposed protections become law, Plaintiffs must rely upon civil litigation to compensate them for their losses and penalize Defendants for their actions.

Defendants knew that a latent defect existed in all houses on KAFB caused by initial faulty construction resulting in the accumulation of moisture in the interstitial spaces of the homes and further resulting in the propensity for mold growth in areas both hidden from the view of Plaintiffs (attics) and in their living spaces and which did in fact result in the recurrence of mold growth in Plaintiffs' home.

2

Plaintiffs' motion does not address the implied warranty of habitability and therefore Plaintiffs will not respond to those arguments made by Defendants in this regard.[1] Plaintiffs' motion is a motion for partial summary judgment on their latent defect claim and is limited to the elements of duty and breach.

## FACTUAL CHRONOLOGICAL TIMELINE OF EVENTS[2]

The undisputed facts as set forth in the following timeline created solely with documents produced by Defendants establishes the existence of a known dangerous condition or latent defect and that Defendants breached their duty to warn Plaintiffs of its existence. This list is unique to these Plaintiffs in that it encompasses Plaintiffs' maintenance and leasing documents. The spin which Defendants place on this long list of damaging documents - that the documents establish their efforts to identify and resolve the latent defect - is creative but carries no weight. The duty owed by Defendants to Plaintiffs was not to hide the latent defects from our servicemembers until they got around to fixing them, but was to provide our servicemembers with habitable housing free of defects or to disclose the latent defects so that Plaintiff Cody Stewart could devote his entire energy to the defense needs of our Nation. 50 U.S.C. Sec. 3902.

These undisputed facts in chronological order are:

| | |
|---|---|
| July 27, 2011 | Prior to purchasing the housing on KAFB from the United States, Forest Southern Group, LLC KNA Hunt Southern Group, LLC acquired a List of 198 homes previously inspected at KAFB that had the possible presence of mold (FCRM00000968 and FCRM00000969). **Exhibit 1**. |
| September 12, 2011 | Prior to purchasing the housing on KAFB from the United States, a Report of Limited Property Condition Assessment and Visual Infrastructure Assessment was prepared by AMEC E & I INC |

---

[1] This includes the *Loflin v. Thornton*, 394 So.2d 905 (Miss. 1981) and *Sweatt v. Murphy*, 733 So.2d 207, 210 Miss. 1999 (Miss. 1999) cases which both speak to the implied warranty of habitability.

[2] Because this is the same timeline used by Plaintiffs in their Responses to Defendants' Motions for Summary Judgment, the same exhibit numbers are being used to avoid confusion and assist the Court in its review.

3

(FCRM00000859) for Forest City Military Communities LLC finding suspect visible mold in 56% of the on base units assessed and 54% of the off-base units assessed and recommended a that a Suspect Visual Mold Assessment be obtained. **Exhibit 2**.

September 21, 2011    Quitclaim Deed from USA to Forest Southern Group, LLC KNA Hunt Southern Group, LLC wherein the military housing on KAFB was purchased and became privatized. **Exhibit 3.**

September 30, 2011    United States Department of the Air Force Master Development and Management Agreement for the Privatization of Military Housing between the United States of America and Forest Southern Group, LLC KNA Hunt Southern Group, LLC which includes the defined term "Keesler Mold" and which states in Section 3.5.9 that "The Parties acknowledge that the presence of certain mold conditions at Keesler AFB as of the Effective Date (the "Keesler Mold") will require remediation, the plans for which and the full costs of which have not been determined as of the Effective Date. The Parties agree that the amount of $3,175,514 shall be deposited to the Project Contingency Subaccount held under the Lockbox Agreement on the Effective Date as a contingency to be used to remediate the Keesler Mold (the "Mold Contingency"). (Hunt – Gen04 – 00452). **Exhibit 4**.

September 30, 2011    Property Management Agreement between Forest Southern Group, LLC KNA Hunt Southern Group, LLC and Forest City Residential Management LLC wherein Forest City Residential Management LLC, acting as an independent contractor, agreed to maintain the property in habitable and lawful condition for the benefit of Plaintiffs. (Cooksey - Hunt - Gen04 – 00293). **Exhibit 5.**

September 30, 2011    Keesler Air Force Base Environmental Management Plan (Hunt - Gen05 – 01792) taking the position that "The presence of mold and fungus in occupied buildings may be a health risk under certain circumstances," that the "Response to mold toxins varies by individual, but those most likely to be sensitive to mold exposures include infants and children, the elderly, and those patients whose immune system has been compromised," that "Family Housing will be managed to prevent the occurrence of mold and fungus in occupied areas," that "If mold is identified, it will be abated as soon as practical," and that "The best management approach is to ensure that mold growth does not occur." **Exhibit 6.**

February 17, 2012    Four and a half months after purchase, a Report of Housing Assessment for Moisture Related Problems was generated by Liberty Building Forensics Group (FCRM00000361) finding ductwork leakage allowing outside air to enter and result in condensation on certain surfaces mostly around the AHU's, transfer grilles that are too small resulting in depressurization of

the main part of the house under certain conditions, that the outside air being introduced into the home is not sufficient to offset the wind effects and needs to be three times larger, that the AHU's are not sized to provide sufficient dehumidification, that the attic is the leakiest portion of the building envelope and is the main entry point for wind driven outdoor air in the homes, that air infiltration rates increase when the attic fan operates; that attic fan operation is not reducing attic dewpoint because fan operation alone is not a dehumidification process and that modifications to compressor staging are not sufficiently improving the run time. **Exhibit 7**.

August 3, 2012    Ten months after purchase, a Letter Bullet List to Further Delineate Implementation of Scope of Work Keesler AFB Housing Assessment for Moisture Related Problems was generated by Liberty Building Forensics Group (FCRM00000520) describing in detail the immediate interim repairs, the intermediate repairs and the long term repairs, all of which were at that time required to minimize conditions conducive to future moisture damage. **Exhibit 8**.

October 2, 2012    One year after purchase, Building Science Corporation's Enclosure and HVAC Analysis of Housing Units on Keesler Air Force Base was generated (FCRM00001096) identifying two fundamental problems with the Keesler AFB housing units, excessive air change and depressurization and sweating sheet metal ducts. The report further explained that leaky ductwork leads to excessive air change and negative pressures within houses and excessive air change leads to elevated levels of interior moisture and interior surface mold. **Exhibit 9**.

November 6, 2012    Thirteen months after purchase, Rimkus Consulting Group Inc. issued its report titled HVAC System Evaluation Keesler Air Force Base Housing Growth (FCRM00000931). Rimkus was retained to inspect a sample of the housing units that have experienced mold growth and provide recommendations to help limit or eliminate the formation of the suspected fungal growth. The report concluded that the fungal growth observed on the diffusers and the bathroom ceilings indicated areas of high humidity where moisture was condensing on cold surfaces, that additional attic ventilation would reduce condensation, that additional ventilation can be provided by fixing insulation baffles adding ridge vents or combining power ventilators with existing roof vents, that outside air ducts if used should be interlocked with the cooling mode and not the fan mode so that unconditioned air does not blow into the house, that bathroom fans should have back draft dampers installed so that unconditioned air does not leak into the bathrooms when the fan is not operating, and that duct chases going from the air handler to

the attic should not only be insulated but should also have a vapor and air seal. **Exhibit 10**.

November 9, 2012    Historical maintenance records show that the coating on the ducts in the HVAC closet was coming off. Stewart-Hunt-Gen02-00055 **Exhibit 17**.

December 18, 2012    Fourteen and one half months after purchase, a Mold Management Plan (FCRM00000726) was prepared by Forest City Military Communities LLC to provide guidance in the prevention, identification, remediation, communication, management and training related to mold in managed housing communities and recognized that the key to mold control is moisture control. **Exhibit 11**.

January 3, 2013    Historical maintenance records show that inspection and cleaning in and on air conditioning vents. Put alarm back and cleaned vents. Stewart-Hunt-Gen02-00051 **Exhibit 17**.

January 3, 2013    Historical maintenance records show that the resident called and reported a suspected substance in the master bathroom and on the baseboards.  Stewart-Hunt-Gen02-00052 **Exhibit 17**.

February 22, 2013    Seventeen months after purchase, after learning that the remediation cost would range from "several hundred thousand to more than seventeen million dollars," a plan was developed to repair only a sampling of 32 out of 998 units at a cost of $180,479, which would be left to sit for a "cooling season" to see if the repairs worked. (FCRM00001094). **Exhibit 12**.

March 18, 2013    Seventeen and one half months after purchase work finally commenced on 32 test units and was substantially complete on April 16, 2013. The 2 contractors working on the repairs gave reports to Forest City describing the defects to be corrected.

April 22, 2013    Nineteen months after purchase, a report titled Keesler AFB Privatized Housing Complex Residential Modifications Recommendations and Observations was generated by J.O. Collins Contractor Inc. (Hunt - Gen05 – 00193) opining that the major contributing factor with regard to the moisture issues that have plagued the units is the installation of the duct work, most of the units having ill fitted connections that were not screwed together properly, were not taped properly, were not sealed with mastic properly resulting in large gaps in some of the ductwork **Exhibit 13**.

April 26, 2013    Nineteen months after purchase, a report titled Observations on HVAC Rehabilitation was generated by Kimbel Mechanical Systems (Hunt - Gen05 – 00471) estimating that repairs could be made to all units in less than 1 year, "We can mobilize 3 separate

teams for this project that could do 2 units per day after their initial 'ramping up period' was over. That should allow us a pace of about 120 units per month." **Exhibit 14**.

| | |
|---|---|
| May 1, 2013 | One year and seven months after purchase, a Prototype Completion Report HVAC Improvements Project was prepared by Forest City Military Communities (Hunt - Gen05 – 00363) containing a list of 12 defects existing in base housing and finding that the energy efficiency of the existing homes was likely compromised by the poor quality HVAC ductwork installation and  the existing conditions noted in the attic spaces of the subject prototype units and that the whole of the remaining housing within the project would benefit by, and would likely require remediation. **Exhibit 15**. |
| May 25, 2013 | Historical maintenance records show that a prior resident reported water leaking from the air conditioning unit and flooding the storage room and also the garage. Stewart-Hunt-Gen02-00043 **Exhibit 17**. |
| December 23, 2013 | Two years and three months after purchase, a report was  prepared by Forest City (FCRM00001001) summarizing the ongoing concerns over the poor construction workmanship and indoor air quality performance of the HVAC systems installed within the military family residential units at Keesler AFB and noting that the findings of both investigations to date were consistent and indicated that the indoor air quality and the ability to control moisture within the homes at Keesler AFB was compromised by the poor workmanship employed in the HVAC ductwork installation and finding continuing uncontrolled moisture concerns within the interstitial floor spaces of representative structures including moisture and mold build up on ceilings located in the upstairs of the homes and the downstairs sub floor areas. **Exhibit 16**. |
| March 12, 2014 | Historical maintenance records show that a prior resident reported that the master shower was separating from the wall and that there was visible water damage in the bathroom from the shower. Stewart-Hunt-Gen02-00028 **Exhibit 17**. |
| June 2, 2014 | Historical maintenance records state that the air conditioning unit was leaking into the home. Stewart-Hunt-Gen02-00011. **Exhibit 17**. |
| August 11, 2014 | Plaintiff, Cody Stewart, Rank O4, entered into a Military Lease Agreement with Forest City Southern Group, LLC NKA Hunt Southern Group, LLC (Owner), owner of the property located at 730 Vandenburg Dr. Biloxi MS 39531 (Subject Property) on August 11, 2014. In accordance with the lease, the property was |

managed by Forest City Residential Management, LLC (Agent) who was authorized to manage the Subject Property on behalf of Owner and to receive rents, execute leases, enforce leases, and give and accept notices, demands and service of process on behalf of, and as Agent of Owner. **Exhibit 22**.

August 11, 2014    Plaintiffs' initial walkthrough/move in inspection of the Subject Property took place. This walkthrough did not include an inspection of the attic or the interstitial areas of the home although prior investigations procured by Defendants and the admissions in the 2015 lawsuit indicated that these were the areas where the hidden latent defects involving most moisture and mold accumulation were located.  Affidavit of Plaintiff. **Exhibit 23**.

January 28, 2015    Plaintiff called about mold eating insects observed in the home. Stewart-Hunt-Gen0001 **Exhibit 24**.

February 13, 2015    Three years and four and one half months after purchase, a Complaint was filed by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC against Hunt Building Company, Ltd., Hunt Yates, LLC, W.G. Yates & Sons Construction Company and others in the in the Circuit Court of Harrison County, Mississippi Second Judicial District referred to by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC as the "latent defect claim." **Exhibit 18**.

This latent defect claim asserted that defects, hidden from view by the fraudulent actions of the defendants, existed in housing on Keesler Air Force Base and that after Forest City took over ownership of KAFB housing it begin to receive complaints from residents about water infiltration and indoor air quality issues, that these complaints revealed potential problems with the building design and construction, as well as the performance of the HVAC systems, that an apparent attempt to address the ongoing problems with the structures failed to adequately address the problems, that in an attempt to conclusively establish the cause(s) of the problems reported by the residents Forest City created and implemented a remediation plan on a sample of the 1028 structures which universally revealed "shoddy workmanship" and proceeded to describe the "shoddy workmanship" with a list that detailed no less than ten latent defects.

The complaint further describes the hidden defects discovered by them after purchasing the properties  as follows: "numerous branch duct and main trunk runs were found to be unsupported and buried below the blown in insulation in order to fraudulently conceal the shoddy workmanship" and "the shoddy workmanship was fraudulently concealed in a manner intended to prevent discovery" and "Hunt, Hunt Yates, and/or Yates knew or should have known of the

existence of these defects prior to covering them with insulation or closing them in inaccessible locations and therefore fraudulently concealed them from observation."

| | |
|---|---|
| April 2015 | Three and one half years after purchase and 2 years after the test remediation of the 32 units, Forest City's draft long-range plan for mitigating mold in Keesler AFB housing was finally submitted to base command for review and consideration. Forest City proposed to fix the ductwork in the attics of the houses primarily during change-of-occupancy maintenance (COM), i.e. when the houses were vacant. For the more severe problems (mold that reached down to the first floor), work inside the housing units would be required and the families would be temporarily relocated for 3-5 days to guest houses. Forest City proposed to fix 250 units in 2015, 400 units in 2016, and the remaining 300 units in 2017. |
| July 13, 2015 | Plaintiffs reported mold on the ceiling in the pantry and also in the kitchen. Stewart-Hunt-Gen02-0002 **Exhibit 24**. |
| July 13, 2015 | Maintenance acknowledged water and suspected substance in the light in the kitchen overhead light.   Stewart-Hunt-Gen02-00002 **Exhibit 24**. |
| July 16, 2015 | Maintenance inspected the ceiling in the kitchen, pantry and other areas for suspected substance. Cleaned affected area and foamed hole at kitchen light fixture. Stewart-Hunt-Gen02-00002 **Exhibit 24**. |
| July 29, 2015 | Three years and ten months after purchase, the Air Force approved the above plan. |
| September 12, 2015 | Plaintiffs reported air conditioning leaking from unit-interior of home: a/c leaking inside home standing water in room near laundry room where a/c is located. Stewart-Hunt-Gen02-00002 **Exhibit 24**. |
| September 18, 2015 | Maintenance inspected the ceiling in the kitchen, pantry and other areas for suspected substance. Plaintiff reported this is the second time he has had mold. Stewart-Hunt-Gen02-00002 **Exhibit 24**. |
| September 18, 2015 | Maintenance determined that the range hood vent on the roof needed replacing but there was no attic access and it was not flush to the roof allowing humidity in.  Stewart-Hunt-Gen02-00003 **Exhibit 24**. |
| October 02, 2015 | Plaintiffs again reported the presence of mold eating insects in the home. Stewart-Hunt-Gen02-00003 **Exhibit 24**. |
| October 14, 2015 | Maintenance treated for the small black bugs again. Stewart-Hunt-Gen02-00003 **Exhibit 24**. |

November 3, 2015      Plaintiffs moved out due to the conditions existing on the Subject
                      Property. Notice of Intent to Vacate. Stewart-Hunt-Gen01-00010
                      **Exhibit 25.**

## FEDERAL ENCLAVE DOCTRINE DOES NOT APPLY

The term enclave is limited to federal lands with exclusive federal jurisdiction. Defendant have asserted that KAFB is a federal enclave yet have offered no proof in support thereof. Defendants have failed to prove the legislative jurisdictional status of the particular land in question. The fact is that not all places acquired by the federal government were acquired with exclusive jurisdiction.

Since 1940, Congress has required the United States to assent to transfer of jurisdiction over property, such assent being achieved "by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted." *Paul v United States*, 371 U.S. 245, 264-265 (1963) (quoting 40 U.S.C. § 255, now 40 U.S.C. 3112). The effect of this change in the law made the decision to acquire federal jurisdiction on such lands subject to the discretion of the United States. Since the federal law was in effect when the subject property was acquired in 1942, the assent of the Unites States was required. Defendants have not proved the United States accepted the concurrent jurisdiction of Mississippi on the subject property by producing the necessary correspondence. Therefore, the presumption under the federal law is that the United States did not accept jurisdiction.

In *Williams v. State*, 5 So.3d 496, 505 (Miss. App. 2008), the Court explained federal enclave doctrine by citing to several United States Supreme Court opinions:

¶ 24. The United States Supreme Court held in *Surplus Trading Co. v. Cook*, 281 U.S. 647, 650, 50 S.Ct. 455, 74 L.Ed. 1091 (1930), that ownership of land by the United States does not automatically give the United States exclusive jurisdiction. Moreover, the Supreme Court stated the following:

It is not unusual for the United States to own within a State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal.

Id. (emphasis added). Furthermore, the United States Supreme Court has stated: "We made clear that `the State is free to enforce its criminal and civil laws' on federal land so long as those laws do not conflict with federal law." *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 543, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)).

*Williams v. State*, 5 So.3d 496 (Miss. App. 2008) also cited Miss. Code § 3-5-9,

Restrictions on Cession:

The concession of jurisdiction to the United States over any part of the territory of the state, heretofore or hereafter made, shall not prevent the execution on such land of any process, civil or criminal, under the authority of this state, **nor prevent the laws of this state from operating over such land**; saving to the United States security to its property within the limits of the jurisdiction ceded.

Plaintiffs do not bear the burden of proving that their injuries occurred outside a federal enclave. Rather, Defendants have the burden of establishing that Plaintiffs' claims arose inside a federal enclave because it is the party asserting the existence of a federal enclave and its defense is premised on this fact. *Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 480 (Cal. App. 2000). Defendants were obligated to present evidence as to when and how the United States government acquired the property at issue and that all of Plaintiffs' exposures took place on that property. Defendants have failed to do so. *Cundiff v. Lone Star Indus. Inc.* (Cal. App. 2012).

**MANAGING AGENT IS CONSIDERED LANDLORD IN NEGLIGENCE CASES
BASED UPON BREACH OF THE IMPLIED WARRANTY OF HABITABILITY**

The Mississippi Residential Landlord/Tenant Act at Miss. Code § 89-8-7 Definitions;

agent of landlord, sets forth the definition of "landlord" in subsection (d):

> "Landlord" means the owner, lessor or sublessor of the dwelling unit or the
> building of which it is a part, or the agent representing such owner, lessor or
> sublessor.

This may explain why, despite what Defendants would have this Court believe, several

cases in Mississippi have applied the implied warranty of habitability to property managers and

consistently apply the term "landlord" interchangeably to managing agents, employees of

managing agents, present owners and absent owners.   Managing agents are considered the

landlord in negligence cases in which breach of the implied warranty of habitability is an issue

and therefore, Defendant Forest City Residential Management, LLC is subject to Plaintiffs'

claims. See *Williams v. Briggs Co.*, 62 F.3d 703 (5th Cir., 1995) in which Mississippi law for a

landlord's liability for a defect on its premises was applied to Standard Enterprises, the manager

of the apartment building; see also *Mays v. Shoemaker Prop. Mgmt., LLC*, 246 So.3d 72 (Miss.

App. 2018) in which the property manager's duty was to provide "reasonably safe premises" and

"to exercise reasonable care to repair dangerous defective conditions upon notice of their

existence by the tenant;"  see also *Martin v. Rankin Circle Apartments*, 941 So.2d 854 (Miss.

App. 2006) in which the Court determined that the implied warranty oh habitability applied to

the absent property owner, the property manager and its employee; see also *Serrano v. Laurel

Hous. Auth.* (Miss. App. 2013) where the warranty was applied to the government entity that

managed the apartment complex; see also *Moorman v. Tower Management Co.*, 451 F.Supp.2d

846 (S.D. Miss., 2006) in which the Court recognized that although the Tower defendants did not

12

own the property, they did act as agents for the owners in managing the property and therefore were appropriate defendants.

### EXISTENCE OF THE LATENT DEFECT IS A JUDICIAL ADMISSION

On February 13, 2015 a Complaint was filed by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC against Hunt Building Company, Ltd., Hunt Yates, LLC, W.G. Yates & Sons Construction Company and others in the in the Circuit Court of Harrison County, Mississippi Second Judicial District. **See Exhibit M to Plaintiffs' Motion.** This lawsuit was referred to by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC as the "latent defect claim" and is an admission by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC that a latent defect in fact existed in all housing on Keesler Air Force Base. Excerpts from Deposition testimony of John Hoyt, Vice President of Development for Forest City Military Communities from 2008 - 2016 and Vice President for Hunt Military Communities from 2016 - present. **See Exhibit N to Plaintiffs' Motion.**

This latent defect claim asserted that defects, hidden from view by the fraudulent actions of the defendants, existed in housing on KAFB and that after Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC took over ownership of KAFB housing it begin to receive complaints from residents about water infiltration and indoor air quality issues, that these complaints revealed potential problems with the building design and construction, as well as the performance of the HVAC systems, that an apparent attempt to address the ongoing problems with the structures failed to adequately address the problems, that in an attempt to conclusively establish the cause(s) of the problems reported by the residents Forest City created and implemented a remediation plan on a sample of the 1028 structures which universally revealed

"shoddy workmanship" and proceeded to describe the "shoddy workmanship" with a list that detailed no less than ten latent defects derived from the previously listed reports.

Fraud was pled with specificity in the lawsuit. This admission by Defendant Forest City Southern Group, LLC nka Hunt Southern Group, LLC contains unequivocal statements describing the hidden defects discovered by them after purchasing the properties as follows: "numerous branch duct and main trunk runs were found to be unsupported and buried below the blown in insulation in order to **fraudulently conceal** the shoddy workmanship" and "the shoddy workmanship was **fraudulently concealed** in a manner intended to prevent discovery" and "Hunt, Hunt Yates, and/or Yates knew or should have known of the existence of these defects prior to covering them with insulation or closing them in inaccessible locations and therefore **fraudulently concealed** them from observation."

For Defendants to now take the position that a latent defect did not exist on the subject property after filing a pleading with the Circuit Court of Harrison County, Mississippi stating otherwise equates to an admission of making false statements in a pleading filed in a court of law whether or not the equitable doctrine of judicial estoppel applies. Defendants are "playing fast and loose with the courts" and such behavior, although deplorable, is consistent with their actions throughout their ownership and management of housing on KAFB.

### ADDITIONAL UNDISPUTED EXISTENCE OF LATENT DEFECT

Not only did Defendants admit the existence of the latent defect in their prior lawsuit, a fact which is not in dispute, but the latent defect was identified and described multiple times in the reports identified herein, also a fact which is not in dispute. Furthermore, a latent defect by definition is a defect not discoverable by visual inspection. *Parker v. Ford Motor Co.*, 331 So.2d

923, 925 (Miss. 1976). The latent defect was the propensity for the accumulation of moisture leading to mold growth which in fact led to mold growth in Plaintiffs' home. Whether this latent defect was dangerous is a jury question.  Attached to Plaintiffs' motion was the affidavit of Plaintiff William Pate (**See Exhibit S to Plaintiffs' Motion**) wherein he set forth facts which establish that the latent defect could not have been discovered by visual inspection because (1) Defendants did not disclose to Plaintiff any of the reports in their possession that repeatedly confirmed the location of the latent defect – the attic – and (2) because Defendants did not include the attic in the initial walkthrough inspection. Both of these facts are not in dispute. For Defendants to assert now that no latent defect existed is ridiculous.

The latent defect, or known dangerous condition hidden from Plaintiffs in the attic of their home and behind their walls was a plethora of defects leading to moisture and mold growth caused by faulty construction by the original contractor which Defendants failed to repair prior to Plaintiffs leasing the subject property and which plethora of defects is described over and over again in explicit detail in the documents which are being produced under seal. Instead of disclosing what they knew to be a hidden and dangerous defect to Plaintiffs, Defendants continued to hide it. The undisputable fact that Defendants did not disclose these known dangerous latent defects to Plaintiffs is established by deposition testimony referenced in Plaintiffs' motion which will not be repeated here.

## CONCLUSION

In layman's terms, a latent defect is a flaw in property that you cannot easily spot with a superficial inspection and that the lessee does not know exists. This is in contrast to a patent defect, which is a flaw that is fairly obvious that you can usually spot pretty easily. For example, if you are shopping for a house and notice a large crack in the wall or a door with a hole, these

are examples of patent defects because you can spot them so easily. Latent defects could be rooms painted with lead-based paint or a mold problem under the carpeting. These defects are not easily discoverable and may, among other things, render a property dangerous to occupants or make the house unfit for habitation, which is why they must be disclosed.

The flaw in Plaintiffs' home on KAFB was the excess accumulation of moisture in the attic leading to mold growth which Plaintiff did not know existed, which was not easily to spot during a superficial move-in inspection and which was not disclosed to Plaintiffs. The defect was not patent, it was latent. The latent defect was capable of rendering the property dangerous to its occupants/Plaintiffs.   Whether the latent defect was in fact dangerous resulting in harm to Plaintiffs is a question for the jury and is not at issue in this motion.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request this Court grant Plaintiffs' Motion for Partial Summary Judgment and find that a latent defect existed as a matter of law and that Defendants breached their duty to disclose that latent defect to Plaintiffs

Respectfully submitted this 24th day of June, 2019.

RUSHING & GUICE, P.L.L.C.

Attorneys for Plaintiffs

By:      /s/ Maria Martinez
         MARIA MARTINEZ MSBN 9951
         WILLIAM LEE GUICE III MSBN 5059
         R. SCOTT WELLS MSBN 9456
         P.O. BOX 1925
         BILOXI, MS 39533
         Voice: (228) 374-2313 Fax: (228) 875-5987
         mmartinez@rushingguice.com
         bguice@rushingguice.com
         swells@rushingguice.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this 24th day of June, 2019, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all known counsel of record by operation of the court's electronic filing system.

*/s/ Maria Martinez*
MARIA MARTINEZ